FILED
2018 Apr-05 AM 09:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

**FILED**

| | |
|---|---|
| KEITH PADGETT, | ) |
| | APR - 4 2018 |
| Plaintiff, | ) |
| | UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ALABAMA **CIVIL ACTION NO.:** |
| vs. | ) |
| | ) |
| THE BOARD OF TRUSTEES OF THE | )   **JURY DEMAND** |
| UNIVERSITY OF ALABAMA; THE | ) |
| UNIVERSITY OF ALABAMA AT | )   **2:18-cv-00537-TMP** |
| BIRMINGHAM; ANITA C. WEBB, | ) |
| individually and in her official capacity; | ) |
| CORA E. LEWIS, individually and in her | ) |
|   official capacity, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, KEITH PADGETT, (hereinafter referred to as "Padgett"), individually, and via

*Pro Se* submission, brings this Complaint for Damages and Demand for Jury Trial against

Defendants, the BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA (hereinafter

referred to as "Board"), the UNIVERSITY OF ALABAMA AT BIRMINGHAM (hereinafter

referred to as "UAB"), CORA E. LEWIS (hereinafter referred to as "Lewis"), and ANITA C.

WEBB (hereinafter referred to as "Webb") (collectively referred to as "Defendants"), and in

support of his claims, states the following:

## INTRODUCTION

Padgett's claims herein come forth because of his unlawful discharge, an orchestrated

pretext done by Defendants in retaliation for reporting a hazardous waste leak to outside

1

agencies, notifying UAB's Human Resources officers that two female supervisors were forging documents in furtherance of federally-funded study fraud and subjecting Padgett to repeated acts of gender discrimination.

As the claims herein arise from violations of Padgett's civil rights, Padgett brings forth claims under 42 U.S.C §1983.   Additionally, Padgett brings forth claims for Disparate Treatment, Gender Discrimination and damages under Title VII of the Civil Rights Act.

## JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction over this action under 28 U.S.C. §1331 because the claims herein arise under the Constitution, laws, or treaties of the United States.

2.  Venue is proper in the United States District Court for the Northern District of Alabama under 28 U.S.C. §1391(b)(2), which states that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

3.  Since the claims herein present a federal question, all parties are domiciled and/or reside here, and a substantial part of the events giving rise to Padgett's claims occurred in this judicial district, jurisdiction and venue and properly established before this Court.

## PARTIES TO THE ACTION

4.  Plaintiff Padgett is *sui juris* before this court, a natural person over the age of 18, and a citizen residing in this district.  At all material times herein, Padgett was an employee of UAB.

2

5. Defendant Board is comprised of officials who are responsible for policy and governance of the University of Alabama at Birmingham.

6. Defendants Board and UAB are an entity subject to suit under Title VII and an "employer" subject to suit under Title VII and is a "person" for purposes of 42 U.S.C. § 1983.

7. Defendant UAB is a public research post-secondary educational institution. UAB maintains its campus, offices, management, support staff, and daily operations in Birmingham, Alabama.

8. Defendant Lewis is *sui juris* before this court, a natural person over the age of 18, and upon information and belief, a citizen residing in this district. At all material times herein, Lewis was a supervisor within UAB's Division of Preventive Medicine, acting in her capacity as such, under the care and control of UAB.

9. Defendant Webb is *sui juris* before this court, a natural person over the age of 18, and upon information and belief, a citizen residing in this district. At all material times herein, Webb was a supervisor within UAB's Division of Preventive Medicine, acting in her capacity as such, under the care and control of UAB.

## RELEVANT FACTUAL ALLEGATIONS

10. Defendants acted in concert in a calculated and sentinel scheme to deprive Padgett of his civil rights.

11. Padgett was employed at UAB from October 2008 until February 2017, with the last 7 years at UAB as a program coordinator for the MOST Study in the Division of Preventive Medicine ("DOPM").

3

12. On February 10, 2017, Padgett's employment was terminated by Lewis. with Lewis stating that Padgett had violated UAB Employee Rule 7.3 by making a false statement to a UAB Human Resources employee, Anita Bonasera ("Bonasera"), and that Padgett was insubordinate "by disregarding a previous directive not to come into the building to work without prior authorization."

13. Lewis had decided that Padgett should be fired for engaging in protected speech and acts and she enlisted Bonasera to manipulate Padgett and subsequent investigations to arrive at the predetermined outcome (Padgett's discharge from employment).

14. Padgett's questioning by Bonasera came about after Padgett contacted several outside agencies about old equipment that was leaking mercury in the clinic on the 7th floor of the DOPM where Padgett worked.

15. By August 2016, Padgett exhibited obvious physical symptoms of what a January 3rd, 2017 blood test would reveal were side effects of mercury poisoning.

16. Padgett was never trained to use any mercury-containing equipment and the study he coordinated used electronic blood pressure (BP) machines.

17. However, scattered throughout the clinic were numerous old manual BP devices that each contained several pounds of mercury.

18. The BP devices hadn't been serviced in more than 10 years and had been left unattended in desk drawers, boxes, under sinks and in bathroom showers.  Their use was discontinued years before Padgett came to work at the DOPM.  The various BP devices were 30-45 years old.  The rubber hoses had dried out, become brittle, cracked and leaked mercury.

19. BP hoses undergo frequent twisting, pulling, stretching and bending and are not designed to last indefinitely.

20. Padgett's office was carpeted while the rest of the approximately 52-room-clinic was tile flooring. That carpeting accumulated a significant amount of mercury that was tracked in from other areas of the clinic, in addition to the spilled bottles of mercury that had been left in a box in one of the five desks in Padgett's office.

21. The regulations of the National Institutes of Health ("NIH") and the National Institute on Aging ("NIA") are quite clear. The Principal Investigator ("PI") of NIH/NIA-funded studies is the sole and ultimate person responsible for the safekeeping of study equipment. A PI can delegate some tasks but is still required to verify the tasks have been performed correctly.

22. Lewis is the PI of the studies that used the manual BP devices that leaked mercury and was responsible for their safekeeping.

23. As the identification, safe handling or disposal of mercury or mercury-filled equipment was outside the scope of Padgett's training and employment, he was unsure who to contact about the mercury leaks. However, based on prior observations of institutional dishonesty, Padgett believed DOPM and UAB administration would be unlikely to conduct a thorough investigation to determine how long the mercury had been leaking and how many people, vehicles and homes had been contaminated. Plaintiff believed that the Occupational Safety and Health Administration ("OSHA") was the appropriate agency to investigate hazards in the workplace.

24. Padgett filed a complaint with OSHA on or about January 10, 2017. Concerned that he would be fired for reporting the hazard, Padgett selected the option to withhold his name from being disclosed to UAB.

25. On or about January 14, 2017, an OSHA inspector called Padgett and explained that OSHA has no jurisdiction over state employees. Padgett was told to contact the Alabama

Department of Public Health ("ADPH") in Montgomery and was given contact information for the health care facility division. Padgett then called and e-mailed that department.

26. On January 19, 2017, the ADPH responded to Padgett's e-mail, directing him to contact the Jefferson County Department of Health ("JCDH"). Padgett called the JCDH and was then directed to contact the Alabama Department of Environmental Management ("ADEM"). An inspector with ADEM then referred Padgett back to the JCDH. Padgett was forwarded to several employees within the JCDH and eventually found one who had prior experience with UAB. That employee stated the only option he could think of was to report the mercury to UAB Health & Safety Department ("H&S").

27. Subsequently, Padgett told two coworkers that he'd been unable to find an outside agency that would do anything about the mercury leaks.

28. One of those coworkers, Paul Goodner, stated that he knew the H&S reporting procedure and would contact them. Goodner also recorded video of the mercury leaking in various areas of the clinic and contacted H&S that day, Thursday, January 19, 2017. H&S began removing some of the mercury at that time. H&S returned the next day and stated they didn't have the equipment to remove such a large amount of mercury and that an outside contractor would have to be hired. Employees in the contaminated area were then sent home early and the mercury removal began that weekend.

29. During the week beginning January 23, 2017, the DOPM was closed longer than anticipated for decontamination and Lewis directed and partially participated in a search of employee desks on the 7th floor of the DOPM.

30. When Padgett's desk was searched, detailed notes he had been keeping about events he witnessed were discovered. The notes included Padgett's daily work tasks and details about

6

what agencies he'd contacted about the mercury, names and phone numbers; information about gender discrimination that had occurred; an unsigned Equal Employment Opportunity Commission complaint from November 2016 about gender discrimination; details about two female supervisors (Kelly Hardy ("Hardy") and Anita Webb), who had been repeatedly forging documents to defraud federally-funded studies that were managed by Lewis, and a copy of an e-mail sent to UAB Human Resources about the forged documents which violated several UAB Employee Rules, including 7.3.

31. Notes kept by Paul Goodner detailing his observations of gender discrimination and study-related fraud were also removed from his desk. Goodner was the one who first realized that Lewis was violating the Federal False Claims Act by using funds from one study to pay for work on another. Goodner was also fired on February 10, 2017.

32. The documents that Hardy and Webb forged were instrumental in the fraud. Hardy and Webb forged the signatures of employees on their time sheets misstating what studies the employee worked on or the number of hours worked. The contents of the notes were relayed to Lewis and she decided that Padgett and Goodner should be fired.

33. Padgett was told to return to work on January 26, 2017 at 8:30 a.m.

34. Upon arriving at work, Padgett was told to report to another office and discovered that he had been sent to what's known on the UAB campus as an "HR ambush interrogation." The HR ambush interrogation is when an employee is told to attend a sudden staff meeting or something equally benign that's being held at another office. When the employee arrives, they are greeted by a UAB HR representative and two campus police officers. The HR representative sits across the table from the employee and the police sit slightly behind and

on the left and right side of the employee as if they're going to arrest the employee at any moment. It's a tactic HR uses to intimidate employees.

35. After Bonasera introduced herself and the two police officers, Padgett told her he was going to contact an attorney so they should reschedule the meeting. Bonasera stated that the meeting could not be rescheduled and that Padgett could not have an attorney present. Padgett explained that he believed it was possible that some patients or volunteers who had been contaminated with mercury might be inclined to sue. If Bonasera was questioning an employee with police present, Padgett said that could imply Bonasera was acting as an agent of the police and Padgett would not answer questions for the police or their agent without an attorney present.

36. Bonasera continued to try to question Padgett but he refused to answer and Bonasera left the room for approximately 9 minutes. When she returned, she told the police to leave the room but one came back and stood at the open door behind Padgett. Bonasera asked Plaintiff to recount what he knew about the mercury leaks, what agencies he had contacted, if he had spoken to a reporter and any other details he could remember.

37. Padgett complained to Bonasera that appropriate actions were not being taken to determine how long mercury had been leaking, how much had escaped, how many employees, research volunteers and patients had been contaminated and that DOPM administration was being willfully negligent in its responsibilities.

38. In addition to research studies, the 7th floor clinic of the DOPM also houses the HealthSmart Clinic and the PATH Clinic which treat minority patients for some medical illnesses, many of whom have weakened or compromised immune systems. Padgett stated that those individuals have a right to be told they were exposed to a health hazard and that their homes

should be tested for mercury contamination. Bonasera replied that was not the purpose of her visit.

39. At approximately 9:17 a.m., Bonasera said to Padgett, "Now I want to ask you about something that has absolutely nothing to do with the mercury. Why did you come to work on January 6th?" Padgett asked what day of the week that was and Bonasera said it was a Friday. Padgett replied that he works Monday through Friday. Bonasera asked Padgett to tell her what work he performed that day, including what rooms he went in, what time he arrived and left, who else he saw in the building, how many cars were in the parking lot and even what clothes he wore that day.

40. Padgett explained his blood test results of January 3rd, 2017, and that memory problems were one of the side effects of long-term exposure to mercury. Padgett's memory loss had gotten to the point where he had been writing down what he did at work for several months and that he had the relevant work notes in his desk. Padgett stated that even without memory problems, it was highly unlikely he could remember those kinds of details 20 days later without reviewing his work notes, time sheet, computer logs, e-mail accounts or something to jog his memory. Bonasera said the notes in Padgett's desk had been disposed of and he could not review his time sheet, computer logs or e-mail accounts. Padgett asked, "Will I get in any trouble if I can't remember, if I'm wrong about what I did that day?" and Bonasera replied, "No, just try to remember the best you can."

41. Padgett repeatedly told Bonasera he couldn't remember that far back without assistance. Unbeknownst to Padgett at that time, Bonasera's purpose was to cause Padgett to make what could be considered a false statement, regardless of whether it was intentional or not.

9

42. Bonasera eventually told Padgett he came to work "late in the afternoon" on January 6th, 2017, and went to his office, room 740 and the reception area. Padgett said that sounded like the time he forgot his day planner and looked in the three places that have filing cabinets he uses. What Bonasera claimed was "late in the afternoon" was only 12:44 p.m. Bonasera later revealed that January 6th was what UAB considered a "bad weather day", the campus was closed and that Padgett was not authorized to work that day. Padgett stated that if he was not authorized to work that day, then he was not working but needed to review his notes, e-mail accounts or time sheet to verify that. Bonasera again refused that request.

43. After Bonasera got an outline of January 6th from Padgett, she stated that she needed his written statement and he would immediately be placed on administrative leave while his answers were verified. Padgett's ID card and keys were taken and remote access to his two e-mail accounts, time sheets and Oracle employee account was suspended. Padgett would not be allowed to review any of the information that would enable him to give an accurate answer to Bonasera.

44. Accordingly, Padgett was forced into a situation where a correct answer was impossible and then punished for not being able to give a correct answer.

45. During the mercury investigation, ID card entry logs and security camera footage was reviewed for the 7th floor of the DOPM to determine if anyone was in the building after their usual work hours.

46. Female employees who were in the building after their usual work hours were not subjected to the same "ambush interrogation" that Padgett was.

47. Female employees were questioned informally without police present, but usually with Lewis present.

48. Female employees could review their time sheets, e-mail accounts, computer logs, Oracle entries and anything else they wanted to be able to answer questions.

49. Female employees were not placed on administrative leave while their answers were verified.

50. If Padgett had been allowed access to his time sheet, e-mail accounts or work notes or questioned the same way female employees were, he would have known exactly what day Bonasera was talking about and that he had been authorized to work January 6th.

51. DOPM employee time sheets are due by 12 noon every other Thursday. If an employee must work the Friday or Saturday at the end of a pay period, their projected hours are included on that time sheet, the DOPM Bi-weekly Internal Time Sheet ("BITS"), *see ATT. 1 sample.* It covers a 14-day period, contains the employees name, the studies they work on, the number of hours and what federal accounts their pay is deducted from. The BITS also contain a statement that the employee and their supervisor must sign certifying that the information shown is correct. The signed BITS are returned to the accounting office by noon every other Thursday. The corresponding daily hours are then entered into the Oracle system by the employee and submitted electronically to their supervisor for approval, again certifying that the information is correct.

52. On January 5th, 2017, Padgett's BITS had been approved by his supervisor, Kelly Hardy, showing that Padgett would be working 8 hours on January 6th and she submitted that to the accounting department. Hardy also approved Padgett's Oracle submission that stated he would be working 8 hours on January 6th.

53. Padgett clocked out from work on January 5th, 2017 at 2:28 p.m. At 3:55 and 4:40 p.m. that day, e-mail notices were sent stating that if a work area was going to be closed on January 6th supervisors should notify their employees, *see ATT 2, pg 4, first paragraph.* Those same

11

instructions are also stated in the UAB Employee Handbook and were included in the e-mail. Padgett had already left work when those e-mails were sent and Hardy did not notify Padgett that his work area would be closed on January 6th.

54. Padgett's January 6th workday had already been approved twice by his supervisor, via BITS and Oracle, and he had received no directive that stated otherwise. Padgett worked for approximately two hours on January 6th, 2017, and left.

55. On Monday, January 9th, Padgett told Hardy that he needed to correct his time for January 6th and Hardy stated that she had already taken care of it. Hardy had entered Oracle using her UAB BlazerID, "DOLPHINS", *see ATT. 3*, and changed Padgett's hours for January 6th. That action automatically generates an e-mail that's sent to the employee whose time has been changed, *see ATT. 4*. Padgett asked another supervisor if there was a new process for correcting time sheets and he was told no, the process is the same as it had been for at least 10 years. A correction was supposed to be made in writing on the BITS and electronically in Oracle.

56. Padgett spoke to one other supervisor and several coworkers and learned that Hardy and Webb had been forging employee signatures on BITS and entering their time into Oracle for approval, violations which call for immediate discharge per UAB Employee Rules, *see ATT. 5, page 61 of Employee Handbook.*

57. Hardy and Webb did not allow employees to see their BITS which contained the studies an employee was supposed to work on and how many hours devoted to each one. Hardy and Webb directed employees to work on the studies they were told to without regard to which study their pay was deducted from.

12

58. On that same day, January 9th, 2017, Padgett called the UAB HR department to ask what to do about supervisors who forged official UAB documents and was told he could e-mail his questions to abonasera@uab.edu. Padgett sent an e-mail to that address on January 10, 2017, stating that two supervisors were forging employee signatures in violation of Employee Rule 7.3, *see ATT. 6.*

59. When the Plaintiff was questioned by Bonasera on January 26th, he was unaware that she was the same individual he had e-mailed about the forged documents on January 10th. It wasn't until January 30th, 2017, that Padgett realized who Bonasera was and sent her another e-mail, *see ATT. 7.* Bonasera called Padgett and asked questions about the DOPM BITS, how an employee's time should be divided, what were the sources of funds and other general questions about the fraud he witnessed. Another meeting was arranged for February 7th, 2017.

60. At the February 7th meeting, Bonasera accused Padgett of having worked unauthorized overtime on January 6th.

61. By this time, the Plaintiff realized what day Bonasera was referencing. Padgett explained that he had not been working overtime, he was still within his 40-hour weekly limit and was authorized to work on January 6th. His supervisor had approved that time in two formats, BITS and Oracle, on January 5th. Padgett further explained that his request to correct the January 6th time from eight hours worked to two was how he had discovered that Hardy and Webb had been forging BITS, which was the reason Padgett had first e-mailed Bonasera on January 10th. Bonasera changed the subject and began asking questions about the documents Padgett had brought, what he and Goodner alleged was study fraud and what occurred that

13

made them feel they were discriminated against. Bonasera then relayed those accusations to Lewis.

62. Webb had hired three men and three women for the same job position, using the same advertisement and requirements. All three men were paid $15.50 per hour while the three women were paid $16-$17 per hour, regardless of their lack of experience.

63. Padgett attempted to discuss with Webb the morale problem that the pay disparity was causing but Webb refused and said she couldn't discuss employee pay.

64. Padgett also had two meetings with Webb to discuss the discriminatory behavior male clinic workers experienced but Webb made no changes.

65. After the two meetings with Webb were unsuccessful, Padgett then spoke to Lewis about the discriminatory treatment. When Webb learned of Padgett's conversation with Lewis, Webb sent Padgett an e-mail on May 03, 2106, stating that he was not to contact Lewis again because "She does not have time for complaints about how you feel..."

66. Webb held staff meetings and sent e-mails stating that Padgett would get the first study participant each day, Paul Goodner would get the second and Cody Belcher would get the third with no mention of what female employees should do. That resulted in a significant increase in workload for the male clinic employees.

67. It had been common practice for years that hourly employees who had worked late Monday through Thursday would leave early on Fridays when they reached their 40-hour limit for the week. Webb sent an email to the three male clinic workers on September 21, 2016, stating that they could no longer leave early on Fridays, that if they worked late they would have to leave early on another day. Female employees could continue leaving early on Fridays, *see ATT. 8.*

14

68. The three male clinic workers were sent to what they were told was a "team-building" class but the female employees were excused from attending.

69. Webb excluded Padgett from one training visit and two site visits for the MOST Study and replaced him with a lower ranking female employee. Most notably, Padgett is the first and only program coordinator to be excluded from site visits and training visits and replaced by an exam technician. The site visits are an important component of study coordination to ensure each research site functions as close to identical as possible.

70. Webb allowed a female employee, Emily Goodner (no relation to Paul Goodner), to take a personal class during work hours, which is prohibited in the employee handbook. Webb subsequently refused to allow Padgett to take a personal class during work hours.

71. Webb allowed Emily Goodner to work from home although she had no work-issued cell phone or tasks to be completed at home. Male employees were not allowed to work from home.

72. Webb allowed Emily Goodner to arrive to work after 8 a.m. but required the male employees to be in at 7 a.m.

73. Emily Goodner stole a life-size skeleton replica from the clinic, which is a violation of Employee Rules. When the felony theft was reported to Webb she did not notify the campus police even though the incident was recorded by security cameras.

74. Webb allowed female employees to leave the clinic while still on the clock, a violation of Employee Rules and cause for immediate termination.

75. Webb excluded Padgett from recruitment activities for the MOST Study and replaced him with a lower ranking female employee. The lack of recruitment information interfered with Padgett's ability to properly perform his job as the study coordinator.

76. Kelly Hardy was a lower ranking technician on the MOST Study but was promoted to supervise Padgett and other MOST Study employees while still retaining her lower ranking technician place on the study. While Hardy was still below Padgett on the study, she was then free to choose her own work tasks and those of Padgett and the others. Padgett had to train Hardy in the requirements of her new position. UAB claims Hardy's new job responsibilities are simply a change of job title for the UAB Career Ladder and not a promotion. However, true Career Ladder changes are not done in a vacuum. The employee in question and their supervisor are notified in advance. There is a paper trail. In addition, Career Ladder changes do not remove employees from one supervisor and transfer them to another. Padgett and other employees were supervised by Webb. Webb or Lewis would have had to initiate the change of supervisor for Padgett and the others. Padgett already had a supervisory job title as program coordinator. Hardy did not have one and needed a job reclassification to be able supervise Padgett and the others.

77. After Padgett and Paul Goodner were fired, Webb hired two women to replace them. Padgett's replacement is paid more than $6,000 per year despite having no experience with a study as large as the MOST Study, which involves 1,500 participants at UAB and is the largest at the DOPM.

78. All the information that Padgett gave to Bonasera about the mercury leaks, study fraud, forged documents and discrimination was then conveyed to Lewis.

79. Lewis made the decision that Hardy and Webb would not be punished for forging documents and multiple instances of violating Employee Rules, including 7.3, but that Padgett would be fired for violating Rule 7.3 by making a false statement to UAB HR.

80. Emily Goodner, a new DOPM employee, had intentionally made false statements to UAB HR employee Kelly Mayer in May 2016 in an attempt to have Padgett fired.

81. At all material times, Emily Goodner was married and a new employee hired by Webb.

82. Between March 15, 2016, and May 6, 2016, Emily Goodner repeatedly texted Padgett asking him to go to bars and restaurants, sporting events, to go running with her, to go to yoga classes with her, to come to her house for dinner, to go to her children's sporting events and practices, to go with her to pick up her children from school and to be their male nanny. Goodner also had conversations with Padgett where she voiced the same invitations and Padgett recorded those conversations.

83. Goodner also texted comments to Padgett about his body.

84. Padgett refused Goodner's advances.

85. Although Emily Goodner was married, she stated that she did have boyfriends but did not consider that to be cheating on her husband because she didn't love her husband. She stated she had married him because he made enough money to support her and her four children.

86. Emily Goodner began coming to Padgett's office every workday, so he used a miniature audio/video device to record her inappropriate comments and flirtations. She would tell Padgett about her extra-marital activities and claimed that speaking with him was therapeutic.

87. Emily Goodner was also recorded making racist comments about some of the female employees, patients and volunteers and sent similar text messages.

88. During the week beginning May 2, 2016, Padgett sought the advice of several coworkers about how to get Emily Goodner to leave him alone and just do her job.

89. On the morning of May 9, 2016, Emily Goodner came to Padgett's office. Padgett told Goodner to stop asking him out because he was never going to be interested in her. Goodner asked that if she wasn't married, would Padgett be interested. Padgett stated that even if Goodner was single and childless, he would still not be interested.

90. Goodner became enraged at that point and began insulting Padgett as he walked away from her. Padgett later sent Goodner a text telling her to apologize to him. Goodner then called Padgett and demanded an apology, saying that Padgett should be grateful she didn't have him arrested. Padgett asked what that remark was supposed to mean and Goodner replied that she could tell the police whatever she wanted and Padgett would be arrested.

91. Padgett realized he needed to record her threats, so he said it was too noisy to hear, that Goodner should call back later and he ended the phone call.

92. Padgett then spoke to a sergeant with the Birmingham Police Department. Padgett was advised to try to get the threats recorded but not let Goodner know the police had been notified. Padgett went back to his office to use a device he had for recording phone calls on a land line. He sent Goodner an e-mail saying he didn't have his cell phone but Goodner could call his office phone. Padgett waited at the office for a little while but Goodner didn't call.

93. The next morning, May 10, 2016, Emily Goodner went to UAB HR and claimed that Padgett had sexually harassed her. She intentionally withheld the fact that she had repeatedly invited Padgett on dates and he repeatedly rejected her advances. Even though she wasn't aware her comments were being recorded, Goodner intentionally withheld the fact that she came to Padgett's office every day to flirt with him and was rejected. Even though she was aware of the numerous provocative text messages she had sent to Padgett and that he would show

18

them to HR, the behavior was indicative of Emily Goodner's dishonest nature and questionable character and made the surreptitious recording of her comments necessary.

94. Padgett was notified about the accusations the following week by HR employees Kelly Mayer and Will Porter. When Padgett offered to retrieve his phone and micro recorder from his office and let them see and hear the comments that Emily Goodner had made to him, Mayer refused. It was obvious by her behavior that she had already made up her mind about the accusations and she was caught off guard by Padgett's evidence. If Mayer didn't punish Padgett, it would expose the fact that she had been fooled by Emily Goodner.

95. Padgett was told he was going to be placed on administrative leave and he could submit the information with his response through his work e-mail account. Mayer had a bizarre demand and told Padgett that he was to write down "the unprovoked trials and tribulations Emily shared" and to include specific details of why Padgett thought Goodner was "unattractive." The response took several days of listening through the recordings to compile and then Porter was out of the office for a few days. In his written response, Padgett stated he would not comment negatively on another person's appearance.

96. Padgett dropped off a micro card copy of his conversations with Emily Goodner at the HR department at 7:30 a.m. on Monday, May 23, 2016.

97. Mayer called Padgett a few hours later and said that he could return to work the next morning and to stop by her office to get his ID card and keys. When Padgett met with Mayer and Porter the next morning, Mayer asked Padgett if he had another copy of the recordings. Based on Mayer's previous presumptive behavior, Padgett was immediately suspicious of the question and replied that was the only _copy_ of the recordings he had but said nothing about the originals.

98. Padgett didn't tell Mayer he'd spoken to the police about Goodner's threats because he thought Mayer would warn Goodner while Padgett hoped she would do something to get herself arrested. During that meeting, at approximately 8:14 a.m., Padgett asked Mayer, "How am I supposed to work with a person that made up lies to try to get me fired?" and Mayer replied, "Just pretend like nothing happened."

99. The next afternoon, Mayer left a voicemail for Padgett and stated that when she opened the envelope with the micro card "it was completely empty, there was nothing in there."

100. Mayer realized that Padgett wasn't the one who put the micro card in a HR envelope and that she had shown the micro card to Padgett and Porter the day before. Approximately 6 minutes later, Mayer sent an e-mail stating that when she opened the envelope the micro card adapter was in the envelope but the adapter itself was empty. Padgett believed that Mayer had disposed of the micro card when she thought it was the only one in existence. Padgett decided to play along and asked if he could put up a $500 reward poster in the HR area for anyone who found the micro card. Mayer did not respond.

101. In addition to being placed on administrative leave for five days, Padgett was written up and had to watch a video tape about sexual harassment.

102. When Padgett asked Mayer why he was being punished, Mayer said that Padgett's rejection of Goodner made her feel uncomfortable and that making someone feel uncomfortable is sexual harassment.

103. Mayer was unable to explain why Goodner's sexualized comments and texts to Padgett were not considered sexual harassment.

104. During that last meeting with Mayer, Padgett stated that he could retrieve the original recordings of Goodner from a laptop and make another copy for Mayer. Mayer said that

20

would not be necessary as she considered the matter to be closed. Goodner was not punished for intentionally violating Employee Rule 7.3 by making false statements to HR or for sexually harassing Padgett.

105. Padgett was told not to discuss the matter with any UAB employees or he would be fired for insubordination.

106. UAB failed to properly investigate and remediate the environment of sexual harassment and discrimination within DOPM.

107. Padgett submitted a complaint to the EEOC and received a "Right to Sue" letter on January 11, 2018, *see ATT. 9.*

108. Padgett has exhausted all administrative remedies available to him.

109. As a direct result of Defendants' wrongful conduct, Padgett's civil rights were violated, Padgett was subjected to a hostile work environment, was retaliated against for "blowing the whistle" regarding the mercury leak and was unlawfully discharged from a position he had held for approximately 8 and ½ years.

110. After Padgett and Paul Goodner were fired, Lewis told remaining employees that "anybody who speaks to them (Padgett and Goodner) needs to go ahead and find somewhere else to work." One employee took her threat seriously and left.

111. NIH and NIA regulations state that the PI of a study is to notify them within 24 hours of a Serious Adverse Event and within 48 hours of an Unanticipated Problem, *see ATT. 10, pg. 4.* As the responsible PI, Lewis intentionally neglected to do that regarding the mercury leaks.

112. Lewis, in concert with DOPM and UAB administration, circulated e-mails, *see ATT.'s 11, 12 and 13,* and held a staff meeting to deliberately misstate the amount of mercury that had leaked as being less than what's shown in video recordings and photos. No steps have

21

been taken to determine if the homes or vehicles of employees, volunteers or patients has been contaminated with mercury.

113. Lewis and other UAB administrators falsely claimed that a small amount of mercury spilled, *see ATT.'s 12 and 13,* on January 19, 2017, and was immediately cleaned up. The mercury had been leaking long enough that Padgett exhibited physical symptoms of mercury poisoning by August 2016 and had a blood test on January 3rd, 2017.

114. Environmental Protection Agency regulations mandate that incidents of one pound or more of mercury, approximately two tablespoons, being released to the environment are to be reported immediately to the National Response Center. UAB H&S intentionally failed to do that.

## COUNT ONE – VIOLATION OF 42 U.S.C. §1983

115. Padgett incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

116. 42 U.S.C. § 1983 provides that anyone who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."

117. At all relevant times herein, Defendants were acting under the color of state law.

118. Defendants' willful and wrongful actions deprived Padgett of his constitutional right to liberty and the pursuit of happiness.

119. Padgett was deprived of his right to work in a non-hostile environment.

120. Padgett was deprived of his right to work in an environment free of gender discrimination.

121. Padgett was deprived of his right to work in an environment free of sexual harassment.

122. Padgett was deprived of his right to work in a safe environment, free of mercury contamination.

123. As a direct and proximate result of Defendants' actions, Padgett has been emotionally and financially damaged.

## COUNT TWO-

## VIOLATION OF TITLE VII, CIVIL RIGHTS ACT (Disparate Treatment)

124. Padgett hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

125. To establish a prima facie case of disparate treatment, the plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated employees outside of his class more favorably; and (4) he was qualified to do the job. *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir.2008).

126. Padgett was a member of a protected class.

127. Padgett was subjected to adverse employment action – discharge from employment.

128. To qualify as an adverse employment action, an employer's conduct that falls short of "an ultimate employment decision, **must**, in some substantial way, alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, **or adversely affect his or her status as an employee."**

23

[*Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir.2008)] (alterations and internal quotation marks omitted) (emphasis added).

129.   Specifically, a Title VII claim requires the employee to establish that he experienced "a serious and material change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir.2001).

130.   Padgett was adversely affected by the wrongful discharge of his employment with UAB.

131.   UAB treated female employees, similarly situated in position within UAB, more favorably than Padgett and other male employees in the DOPM.

132.   Padgett was qualified to do his job. Padgett had worked for UAB for approximately 8 ½ years, without incident.

133.   As a direct and proximate result of Defendants' actions, Padgett has been emotionally and financially damaged.

## COUNT THREE-

## VIOLATION OF TITLE VII, CIVIL RIGHTS ACT (Gender Discrimination)

134.   Padgett hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135.   Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's gender, race, color, religion, or national origin." 42 U.S.C. § 2000e-2(a)(1).

136.   Defendants knowingly and willingly discriminated against Padgett on the basis of his gender.

137.    As indicated *supra*, UAB's DOPM has a demonstrated history of treating female employees preferably to male employees. *See ¶¶41-43, 55-56, 58, and 61-70.*

138.    Defendants' intentional discriminatory acts against Padgett have caused Padgett to suffer emotional and financial damages.

## PRAYER FOR RELIEF

1.    Plaintiff requests the following equitable relief:

a.    Grant Plaintiff a permanent injunction enjoining the Defendants, their officers, agents and employees from continuing to violate Title VII of the Act of Congress.

b.    Order the Defendants, their officers, agents and employees to adopt and implement policies and procedures to remedy the pattern or practice of conduct described herein above.

c.    Grant Plaintiff compensatory and punitive damages against each of the Defendants in their individual and official capacities.

d.    Grant Plaintiff an Order requiring the Defendants to make the Plaintiff whole by reinstating him to his previous position or awarding front-pay, by awarding him back-pay as well as lost pension and fringe benefit credits, compensatory and punitive damages.

e.    Award such other and further relief as this Court may deem appropriate.

25

## DEMAND FOR JURY TRIAL

Padgett hereby demands a trial by jury on all triable issues.

Dated: April _04_, 2018.

Respectfully submitted,

Keith Padgett
Pro Se Plaintiff
P.O. Box 55721
Birmingham, AL 35255

Run Date: 01/09/2017 5:06 pm

**Payperiod: 1/8/2017 - 1/21/2017**

**For: Cagle, Katie**

## DOPM Biweekly Internal Time Sheet (BITS)

| | SUN | MON | TUE | WED | THU | FRI | SAT | Subtotal |
|---|---|---|---|---|---|---|---|---|
| Hours Worked 1/8/2017 - 1/14/2017 | | | | | | | | |
| Hours Worked 1/15/2017 - 1/21/2017 | | | | | | | | |

| | LEGEND |
|---|---|
| HOL | Designated Holiday |
| PH | Personal Holiday |
| V | Vacation |
| S | Sick |
| BE | Bereavement |
| JD | Jury Duty |

| Study | GL account | Project | Task | Award | Org | Estimated % | Actual % |
|---|---|---|---|---|---|---|---|
| CARE Trial 15-20 | | 327310 | 01.01 | 2014724 | 10 | 15.00% | |
| MOST Renewal II 16-17 | | 327468 | 01.02 | 2016030 | 10 | 85.00% | |
| | | | | | | 100.00% | |

Additional funding sources for this pay period:

THE ABOVE ESTIMATE OF YOUR DISTRIBUTION OF EFFORT IS UTILIZED AS A TOOL IN PREPARING COST PROJECTIONS. IF THE NUMBER OF HOURS YOU ARE CURRENTLY WORKING PER WEEK CHANGES SIGNIFICANTLY, OR YOUR RESPONSIBILITIES CHANGE AND THE ABOVE NO LONGER REPRESENTS AN OVERALL APPROXIMATION OF YOUR EFFORT, PLEASE NOTIFY YOUR SUPERVISOR IMMEDIATELY.

I have reviewed and certify that the hours shown are correct and that the account distributions reasonably reflect the effort expended toward those activities.

Signature of Employee:                                    Signature of Supervisor:

Katie Cagle                                                       Kelly Hardy

**From:** UAB Emergency Management Team [                    ]        ATT. 2
**Sent:** Thursday, January 05, 2017 4:40 PM                            PG 1
**To:**
**Subject:** UAB B-ALERT: Winter Weather Alert

Due to the threat of winter weather, normal UAB university operations will be closed Friday, January 6. The School of Optometry clinic will also be closed Friday, but no changes have been made to other UAB Medicine hospital or clinic schedules (including the School of Dentistry clinic) at this time.

UAB Medicine faculty and staff will receive updates/direction through supervisors and routine hospital and ambulatory notice processes. Faculty and staff unsure of your status, please inquire with your supervisor.

Personnel who must remain on campus during weather events should have at least a two-day supply of their prescription medications with them.

Updates and more information will be posted to                                    .

**DO NOT REPLY TO THIS EMAIL.**

You are receiving this from an email address that is not routinely monitored. To submit questions or comments send to

Go to                                for updates and to manage contact info.

**From:** dopmannouncement
**Sent:** Thursday, January 05, 2017 3:55 PM
**To:** DOPM All Users
**Subject:** FW: Reminder about Bad Weather Plan

ATT 2
PG 2

Anitra Baylor | Asst To Division Dir-Medicine | Preventive Medicine

P: 205.934.6372 | F: 205.934.9395 | ark@uab.edu

**CONFIDENTIAL NOTICE:** "The information contained in this email message is privileged and confidential information and intended only for the use of the individual or entity named in the address. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this information is strictly prohibited. If you received this information in error, please notify the sender and delete this information from your computer and retain no copies of any of this information."

**From:** Clark, Ted
**Sent:** Thursday, January 05, 2017 3:51 PM
**Subject:** Reminder about Bad Weather Plan

**Reminders:**

Faculty and Staff may view updates regarding UAB Campus operations here.

http://www.uab.edu/emergency/   (under UAB Quick links Emergency/B-Alert

## Current Winter Weather Potential

**UAB officials are aware of likely winter weather and possible snow/ice accumulation beginning Friday, Jan. 6. We are closely monitoring National Weather Service predictions and will provide updates Thursday regarding campus operations on this page, via the UAB B-Alert emergency communication system, and through routine hospital and ambulatory notice processes.**
Register to receive B-Alert messages or manage your account.

## YOU and UAB Handbook for Faculty and Staff

http://www.uab.edu/humanresources/home/images/RecordsAdmin/7868-
You_UAB_Handbook-Final_7-15-16.pdf

## 9.4 Emergency Preparedness

ATT. 2
PG 3

During any actual emergency or severe weather situation, the official source of UAB information will be found at www.uab.edu/emergency. In addition, the UAB Emergency Management Team will use **B-ALERT**, the Universitys emergency notification system, to communicate through voice calls, SMS text messages and e-mails to the entire campus all at the same time. **B-ALERT** also integrates with Facebook and Twitter. The UAB Severe Weather & Emergency Hotline at 205-934-2165 also will be updated as appropriate during such instances to provide official updates on the University's and UAB Hospital's opening and closing status.

## 10.1 Inclement/Bad Weather Policy

Occasionally the Birmingham area experiences bad weather with snow and ice on the roads making it difficult for employees to get to work. At these times, the University of Alabama at Birmingham may be officially closed. However, UAB provides many essential services, including patient care, which cannot be suspended. Therefore, the Universitys policy regarding inclement weather must reflect the different nature of work and the diversity of the various departments. While essential services will be continued, sometimes it may be considered prudent by the administration to suspend less sensitive elements of the operation.

36

In the event the University is not officially closed, employees experiencing problems (icy roads, dead battery, etc.) should contact their supervisor by telephone for reporting instructions. With the supervisors approval, the employee may be allowed to utilize accrued vacation or personal holiday time.

Official instructions to employees will be issued over WBHM (90.3 FM) radio station and will be announced on the UAB Web site. Please review the guidelines below to determine if a particular work area is designated as essential or non-essential.

## Non-Essential Services

ATT. 2
PG 4

If the University is officially closed, employees in non-essential work areas are not typically required to report to work. However, even in nonessential areas, certain functions must continue. Employees in those areas should receive instruction from their supervisors prior to notice of a closing to determine if it is necessary for them to call in to report their specific conditions and receive scheduling information.

The following guidelines should be used in reporting time for employees of non-essential services during inclement weather or other emergency circumstances.

If the University is officially closed and the employee is not required to report to work, the time off will be considered Away with Pay. Employees who are scheduled to work but do not call in or report off from work will not receive compensation. With the approval of their supervisor, employees who call in to report off or who are excused from reporting to work may be given the option of utilizing benefit time.

## Essential Services

The University will remain open in those areas associated with patient care and other essential services; therefore, employees in those departments should make every effort to get to work. When driving is difficult, employees should start early to allow for possible travel delays. Employees from previous shifts will be held over until relieved by the next shift personnel. UAB employees (exempt or non-exempt) who provide support to The Kirklin Clinic or any other affiliated clinics open for business must call their immediate supervisor promptly for reporting instructions. It is the employees responsibility to understand the inclement weather practice as it applies to their unique work area.

The following guidelines should be used in reporting time for employees of essential services during inclement weather or other emergency circumstances.

Overtime rates will be paid to non-exempt employees for time worked in excess of 40 hours in one work week if applicable. Employees who are required by their supervisors to remain on the premises

ATT. 3

 THE UNIVERSITY OF
ALABAMA AT BIRMINGHAM



# Kelly M Hardy

| | |
|---|---|
| BlazerID: | **dolphins** |
| Internet Email address: | **dolphins@uab.edu** |
| University department: | **Med - Preventive Medicine** |
| University job title: | **Researcher V** |
| Physical location of office: | **Medical Towers (View Map)** |
| Paper mail address of office: | **MT 705A**<br>**1720 2nd Ave S**<br>**Birmingham, AL 35294-4410** |
| Office telephone number: | **(205) 934-2024** |
| Facsimile telephone number: | **(205) 934-1851** |

**UAB**    **ALUMNI**

---

*Is this information incorrect?*
**Please update it!**

ATT. 4

**From:** UAB.Workflow@tuccster.tucc.uab.edu <UAB.Workflow@tuccster.tucc.uab.edu>
**Sent:** Monday, January 9, 2017 8:59 AM
**To:** Padgett, Jeff (Campus)
**Subject:** Request for Approval on Document with Document # 5261508 returned - For Padgett, Keith

**Padgett, Keith,**

Your request for approval on document Type TEL , Document # 5261508
- Employee Name Padgett, Keith has been Re-opened by Approver
Re-opened By : DOLPHINS

**Notes:**
Incorrect

Document Locator Link :
https://admin.it.uab.edu:443/OA_HTML/RF.jsp?function_id=30027&resp_id=-
1&resp_appl_id=-1&security_group_id=0&lang_code=US¶ms=5xFz3.K7cAY7DsavtKzfLr-
HJlciKVyvzoK916RB6oPRi-6ZJo3JYm4vkoP.-KrJ&oas=inHIBdHFOS1ibsJwMrpeqQ..

J.    Sleeping during work hours

K.    Violation of, or disregard for, safety practices

L.    Wasting time, loitering, or loafing at work

M.    Failure to cooperate in an investigation or providing false information during an investigation

N.    Failure to disclose a conflict of interest or failure to eliminate a conflict of interest when so directed (See also the Conflicts of Interest Policy.)

O.    Failure to maintain satisfactory interpersonal relationships with co-workers and supervisors

P.    Gambling on UAB premises

Q.    Inappropriate behavior in the workplace, including, but not limited to, horseplay and threatening, intimidating, coercing, or interfering with fellow employees on UAB property or leased space

R.    Inappropriate behavior toward, or discourteous treatment of, patients, students, visitors, or co-workers including the use of profanity and other harassing statements

S.    Negligence or abuse in the use of UAB property or equipment

T.    Poor management practices and/or inattention to duty

U.    Reporting to work when suffering from alcoholic or drug-related hangover

V.    Misconduct in the workplace

W.    Abuse of e-mail, electronic communications, and/or computer networks

X.    Sexual harassment (See also the Sexual Harassment Policy.)

Y.    Violation of UAB policies or procedures

2.    The following occurrences are cause for immediate discharge without notice or without pay in lieu of notice. Since a complete list of specific offenses is impossible, discharge is not limited to the situations described below.

A.    Absence without notification or reasonable cause for failure to notify. Such absences for three consecutive work days or shifts require no further follow-up prior to termination.

B.    Any act of fighting on UAB property or leased space

C.    Conviction of a felony

D.    Falsifying personnel or pay records, including application for employment, application for transfer, or health records; badging/clocking the time record or signing the time sheet for another employee (See also the Policy Concerning Employee Falsification of UAB Records and Documents.)

E.    Falsifying official UAB records and documents (See also the Policy Concerning Employee Falsification of UAB Records and Documents.)

F.    Forging e-mail, such as sending an e-mail communication in someone else's name

G.    Immoral or indecent conduct on UAB property or leased space or conduct which brings discredit to UAB

H.    Incompetence or inefficiency in patient care

I.    Inexcusable neglect of duties, insubordination, disobedience, or dishonesty

J.    Stealing from fellow employees, patients, UAB, or others on UAB property or leased space

K.    Theft, misappropriation of funds, and/or unauthorized use or removal of UAB property

L.    Possession of firearms, knives, or other weapons and ammunition (See also the Policy Concerning Firearms, Ammunition, and Other Dangerous Weapons.)

M.    Unauthorized accessing of, and/or release of, confidential or official information (See

61

department *with a resultant decrease in salary*. If a demotion is given but without a decrease in salary, the exception to allow this must be approved by the appropriate vice president, the Provost, or the CEO of the UAB Health System and by the Chief Human Resources Officer.

If there is a vacant, lower-level position in another department, the receiving supervisor should be fully aware of the situation causing the demotion and should agree with the reassignment.

All demotions should be documented in writing, and the documentation should be sent to Human Resource Management Relations to be placed in the employee's official, permanent personnel file. Also, a turnaround document should be completed indicating the change in status and pay.

The written record of any disciplinary action taken should be forwarded to the Human Resource Management Relations Office where it will be maintained in a disciplinary log. This process will help insure that discipline administered across campus for the same or similar offense(s) is handled consistently.

Because of special responsibilities related to staffing in the Hospital setting, see also the UAB University Hospital Attendance Policy in Section 12.4 concerning progressive disciplinary action for excessive absenteeism and tardiness by Hospital employees.

### 7.3.1 Discipline Documentation

All documentation of actions involving discipline, written counseling, written warnings, imposed probation, suspension, administrative leave, requested resignations, or discharge should be sent to the Human Resource Management Relations Office to be placed in the employee's official, permanent personnel file. All disciplinary actions also will be maintained in a disciplinary log in the Human Resource Management Relations Office.

### 7.4 Employee Behavior and the Working Environment

Because UAB seeks to maintain an environment conducive to the conduct of business and one in which the rights of others are respected, UAB expects of its employees behavior consistent with the expectations of an institution of higher education. Part of the intent of this section is to identify typical offenses or behavior patterns for which disciplinary actions are taken. This is necessary in order to provide consistent treatment of all employees and so that the rights of some employees will not be violated by other employees.

Although this is not an all-inclusive list, the following are examples of deficiencies or offenses for which progressive disciplinary actions may be appropriate and which may result in discharge:

1. Examples of offenses which generally require discipline and which may result in discharge are as follows:
   A. Absenteeism
   B. Failure to record work time accurately
   C. Failure to report an accident or injury to a patient, student, visitor, or self
   D. Failure to report to work on time
   E. Leaving UAB premises or work area without permission during work hours; unexcused absences
   F. Malicious mischief
   G. Misuse of sick time privileges and benefits
   H. Neglect of duty or inattention to duty
   I. Negligence in the performance of duty or productivity not up to standards

60

ATT. 6

--------- Original Message ---------
From: "Keith" <keithis@juno.com>
To: bonasera@uab.edu
Subject: Question about employee handbook
Date: Tue, 10 Jan 2017 17:10:13 GMT

Hello. I was told this is the e-mail address that I should send my question to. In the UAB and You handbook, section 7.3, the bullet point about signing the timesheet for another employee. We have two supervisors in our department who constantly sign our names on the BITS and won't let us see them. They also enter our time into Oracle and submit it.  We work on different studies and are supposed to divide our time accordingly.  However, we don't know how much time we're supposed to apply to each study since we don't get to see the BITS.  We were told it's the employees responsibility to make sure their time and effort are accurately reported.  How can we do that in this situation?  Is it allowable?

Keith

ATT. 7

---------- Original Message ----------
From: "itskeith@juno.com" <itskeith@juno.com>
To: bonasera@uab.edu
Subject: One other item...
Date: Mon, 30 Jan 2017 09:52:40 GMT

I e-mailed you on January 10th about someone possibly forging signatures on time sheets. I just realized you might not know what time sheets I was talking about. It's the DOPM Biweekly Internal Time Sheet (BITS). It has the employee name, pay period, the name of the studies an employee is being paid from and at what percent. There's a statement near the bottom that says the employee is to notify their supervisor immediately if the work distribution changes and a sentence that reads "I have reviewed and certify that the hours shown are correct and that the account distributions reasonably reflect the effort expended toward those activities" followed by a place for the signature of the employee and their supervisor.

We're supposed to sign a new BITS every two weeks but I've rarely seen mine the past two years as have my coworkers Cody Belcher, Katie Cagle and Paul Goodner. We're only supposed to work on studies that we're being paid from and distribute our time accordingly. It's impossible to know how much time to spend and on which study without the BITS. It seems someone may be forging our signatures on the BITS. The logical choice would be our current supervisor, Kelly Hardy, and before her it could've been Nita Webb. They're the ones the BITS were sent to. Cody, Katie and Paul also said someone is entering their time into Oracle. They were concerned because of that pop-up statement that you have to click on that says something to the effect that the employee certifies their time is accurate.

I don't want to be blamed for anything my signature has been forged on since the employee handbook says falsification of time records is a serious offense and can result in discharge.

Keith

ATT. 8

**From:** Webb, Nita
**Sent:** Wednesday, September 21, 2016 7:48 AM
**To:** Belcher, Cody; Padgett, Keith; Goodner, Paul G
**Subject:** friday

Please be aware that we have a 10:00 new cohort person on Friday. I know we haven't talked about leaving earlier on Fridays but I know that's been happening after folks work a little longer during the week. From now on we need to plan for you all to be here until 3pm on Fridays so if you need to adjust during the week let's make sure that happens. Thanks
Nita

ATT. 9

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To:  **Keith Padgett**
**PO Box 55721**
**Birmingham, AL 35255**

From:  **Birmingham District Office**
**Ridge Park Place**
**1130 22nd Street**
**Birmingham, AL 35205**

|  | On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))* | |
| --- | --- | --- |
| EEOC Charge No. | EEOC Representative | Telephone No. |
| **420-2017-01108** | **Glenda J. Muldrow,** **Investigator** | **(205) 212-2138** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Enclosures(s)

**Delner Franklin-Thomas,**
**District Director**

**JAN 0 3 2018**

*(Date Mailed)*

cc:  **Robert A. Barnes**
**Employee Relations Manager**
**UAB**
**AB 215, 1720 2nd Ave. S.**
**Birmingham, AL 35294**

ATT. 10
PG. 1

## NIA Adverse Event and Serious Adverse Event Guidelines

### BACKGROUND

This guideline describes the requirements and processes for reporting adverse events and unanticipated problems to the National Institute on Aging (NIA). It incorporates guidelines provided by the Office of Human Research Protections (OHRP) of the Department of Health and Human Services (DHHS) and describes Food and Drug Administration (FDA) reporting requirements. NIH is obligated to ensure that researchers comply with their approved reporting procedures.  Clinical trial investigators funded by NIA are obligated under federal regulations to appropriately inform the Institute of adverse events and unanticipated problems, and NIA is required to ensure that the appropriate procedures are in place to support this reporting.

### DEFINITIONS

Definitions are from the January 2007 OHRP *Guidance on Reviewing and Reporting Unanticipated Problems Involving Risks to Subjects or Others and Adverse Events, OHRP Guidance*, http://www.hhs.gov/ohrp/policy/advevntguid.html.

### Adverse Event (AE):

Any untoward or unfavorable medical occurrence in a human study participant, including any abnormal sign (e.g. abnormal physical exam or laboratory finding), symptom, or disease, temporally associated with the participants' involvement in the research, whether or not considered related to participation in the research.

### Serious Adverse Event (SAE):

Any adverse event that:

- Results in death
- Is life threatening, or places the participant at immediate risk of death from the event as it occurred
- Requires or prolongs hospitalization
- Causes persistent or significant disability or incapacity
- Results in congenital anomalies or birth defects
- Is another condition which investigators judge to represent significant hazards

ATT. 10
PG 2

**Unanticipated Problem:**

Defined by DHHS 45 CFR part 46 as any incident, experience, or outcome that meets all of the following criteria:

- unexpected, in terms of nature, severity, or frequency, given (a) the research procedures that are described in the protocol-related documents, such as the IRB-approved research protocol and informed consent document; and (b) the characteristics of the study population;

- related or possibly related to participation in the research (in this guidance document, possibly related means there is a reasonable possibility that the incident, experience, or outcome may have been caused by the procedures involved in the research);

- suggests that the research places participants or others at a greater risk of harm (including physical, psychological, economic, or social harm) than was previously known or recognized.

**Adverse Events (FDA) versus Unanticipated Problems (OHRP)**

To summarize,

- All adverse events are not necessarily unanticipated problems

- All unanticipated problems are not necessarily adverse events

- Some events may be both.

## RESPONSIBILITIES

Both the NIA and the investigators it funds have responsibilities with respect to safety reporting.

### NIA

NIA program staff members are responsible for providing:

- Assistance to extramural investigators in understanding and applying adverse event and serious adverse event guidelines and for ensuring compliance with OHRP guidance in all NIA funded clinical research.

- Oversight of these guidelines, which includes periodic review and revision as relevant rules and regulations change.

- Assurance that the Data and Safety Monitoring Plan (DSMP) addresses reporting of adverse events, serious adverse events, and unanticipated problems.

- Verification that all corrective action plans have been adequately implemented.

ATT. 10
PG 3

- Assurance that the study has an independent safety monitoring body commensurate with study risk (Data and Safety Monitoring Board or Safety Officer).

- Ongoing oversight of the safety reporting process to assure that potential safety issues are addressed.

## Investigators

Investigators conducting clinical research are responsible for:

- Assurance that their protocols are conducted in compliance with these guidelines.

- Submission of IRB-approved protocol to the NIA program office. The protocol must include a DSMP that is commensurate with the study risk and reflects this guideline.

  - DSMP describes plans for adverse events, serious adverse events, and unanticipated problems commensurate with nature and complexity of study.

  - Recipients of Serious Adverse Event and Unanticipated Problem reports must include IRBs, DSMB or Safety Officer, and NIA.

- Adherence to the DSMP with respect to timely submission of adverse events, serious adverse events, and unanticipated problems.

## REPORTING PROCESSES

Adverse Events (AEs), Serious Adverse Events (SAEs), and Unanticipated Problems have specific reporting procedures.

## Adverse Event Reporting

All AEs are collected on an Adverse Event Form, a sample of which is shown in Adverse Event Form AEs and/or laboratory abnormalities must be reported. All AEs experienced by the participant during the time frame specified in the protocol (e.g., from the time study drug administration through the end of the study) are to be reported, as outlined in the protocol.

Please note that the AE form contains a column to indicate whether the event is SERIOUS. Thus, SAEs are a subset of the reported AEs.

Routine reporting of AEs is described in the DSMP and may be monthly or quarterly as determined with the NIA staff and / or the DSMB/Safety Officer.

## Serious Adverse Event Reporting

All SAEs, unless otherwise specified in the protocol and approved by the IRB and NIA or DSMB (as applicable), require expedited reporting by the Principal Investigator to the

ATT. 10
PG 4

study's safety monitoring bodies. An expedited report of an SAE can be submitted by telephone, fax, or email and must be reported to the independent safety monitoring body (i.e., DSMB or Safety Officer) and the NIA within 24 hours of the event being reported to the Investigator or as specified in the DSMP.

The expedited report should be followed by detailed, written SAE report as soon as possible. Follow up information may be required and asked for by the independent safety monitoring body directly, or through the NIA or its representative. A sample of the SAE reporting form used for NIH Intramural Programs is shown in Serious Adverse Event Form.

## Unanticipated Problems (UP)

Investigator institutions must have written procedures for ensuring prompt reporting to the IRB and NIA, and others as appropriate, of any Unanticipated Problem involving risks to study participants or others  (45 CFR 46.103(b)(5)). The Unanticipated Problems reporting procedures must include a corrective plan and measures to prevent reoccurrence. It is recommended that such events be reported within 48 hours to NIA unless they are also SAEs.

Reports of Unanticipated Problems, as defined above, should be forwarded to OHRP using ohrp@osophs.dhhs.gov, typically within two weeks of the event.

The flow chart in  AE/SAE Process Flow provides an algorithm of the reporting process.

## CLASSIFYING ADVERSE EVENTS

Adequate review, assessment, and monitoring of adverse events require that they be classified as to *severity*, *expectedness*, and potential *relatedness* to the study intervention. Study protocols must include a description of how adverse events will be classified in these terms.  These classifications determine the reporting requirements.

### Severity

Classifications often include the following:

- *Mild:* Awareness of signs or symptoms, but easily tolerated and are of minor irritant type causing no loss of time from normal activities. Symptoms do not require therapy or a medical evaluation; signs and symptoms are transient.

- *Moderate:* Events introduce a low level of inconvenience or concern to the participant and may interfere with daily activities, but are usually improved by simple therapeutic measures; moderate experiences may cause some interference with functioning

- *Severe:*  Events interrupt the participant's normal daily activities and generally require systemic drug therapy or other treatment; they are usually incapacitating

ATT. 11

Hi Everyone,

I know we had a scare today with the mercury leak found in several of the MOST rooms and the hallway. I wanted to let you know that it has been cleaned up by the Occupational, Health and Safety Dept. Also, the air quality was tested and there were no signs of mercury in the air. So we have the all clear to proceed as normal. We will be removing the carpet in Keith's office and the AC unit in room 741 (do not turn this unit on) as a precaution but it is safe to be in the rooms. Before we received this information we canceled MOST clinic for Friday and we will leave it that way and start fresh on Monday. Please let me know if you have any questions or further concerns.

Thank you,


Kelly Hardy

Researcher V

UAB Preventive Medicine

1717 11th Avenue South

Suite 705B

Birmingham, AL 35205

(205)934-2024

ATT. 12

From: Bakken, Jim
Sent: Friday, January 20, 2017 8:13 AM
To: Zwiebel, Tonya C <TCROW@uab.edu>
Subject: Important Information for Medical Towers

Medical Towers employees,

Yesterday, UAB Occupational Health & Safety (OH&S) was notified of a relatively small amount of mercury located in an area on the 7th Floor of Medical Towers.  The location was immediately isolated and cleaned in accordance with applicable safety standards.  OH&S has subsequently tested the air and no detectable mercury was found.  To date, no one has shown any signs of exposure. UAB continues to monitor.

If you have questions or concerns, please call OH&S at 934-2487.

FW: Important Information for Medical Towers

ATT. 13

From: Baylor, Anitra R
Sent: Wednesday, January 25, 2017 14:46
To: DOPM All Users <DOPMAllUsers@uabmc.edu>
Subject: Talking Points for 7th floor Incident on Last Thursday

Please see below how to respond if asked questions concerning the incident that occurred on the 7th floor last Thursday.

Anitra Baylor | Asst To Division Dir-Medicine | Preventive Medicine

P: 205.934.6372 | F: 205.934.9395 | ark@uab.edu

CONFIDENTIAL NOTICE:   "The information contained in this email message is privileged and confidential information and intended only for the use of the individual or entity named in the address. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this information is strictly prohibited. If you received this information in error, please notify the sender and delete this information from your computer and retain no copies of any of this information."

From: "Pewitt, Randy" <rpewitt@uab.edu>
Subject: Re: DOPM Clinic Response

You will likely be in contact with participants/clients/patients of DOPM projects/activities in the course of your work. While most individuals will not inquire about the conditions on 7th floor, some may. Should you be asked, the following talking points may be helpful:

·      A relatively small mercury spill on the 7th floor was brought to the attention of Occupational Health and Safety, and testing throughout the building also identified traces isolated to a utility room on the 6th floor.

·      The appropriate channels were followed. UAB Health and Safety was immediately notified and immediately responded.

·      We consulted medical and environmental experts inside and outside UAB and hired specialists to assess the Medical Towers building, provide recommendations and assist in remediation.

·      In all tests conducted, mercury identified remained well within industry standards for acceptable workplace safety.

·      We are being very cautious as it relates to our staff and our participants. Safety is paramount to us, and we were cleared to reopen these floors when the safety of the environment was confirmed.

Randy Pewitt, MPH
Executive Director of Emergency Management and Safety

UAB Occupational Health and Safety
933 19th Street South Suite 445
Birmingham, AL 35294
(205) 934-2487

Knowledge that will change your world
www.uab.edu/ohs

Tell us how we are doing: http://www.uab.edu/ohs/customer-survey